74 U.S. 229 (____)
7 Wall. 229
BRONSON
v.
RODES.
Supreme Court of United States.

*230 Mr. C.N. Potter, for the plaintiff in error.
*245 The CHIEF JUSTICE delivered the opinion of the court.
The question which we have to consider is this:
Was Bronson bound by law to accept from Rodes United States notes equal in nominal amount to the sum due him as full performance and satisfaction of a contract which stipulated for the payment of that sum in gold and silver coin, lawful money of the United States?
It is not pretended that any real payment and satisfaction of an obligation to pay fifteen hundred and seven coined dollars can be made by the tender of paper money worth in the market only six hundred and seventy coined dollars. The question is, Does the law compel the acceptance of such a tender for such a debt?
It is the appropriate function of courts of justice to enforce contracts according to the lawful intent and understanding of the parties.
We must, therefore, inquire what was the intent and understanding of Frederick Bronson and Christian Metz when they entered into the contract under consideration in December, 1851.
*246 And this inquiry will be assisted by reference to the circumstances under which the contract was made.
Bronson was an executor, charged as a trustee with the administration of an estate. Metz was a borrower from the estate. It was the clear duty of the former to take security for the full repayment of the money loaned to the latter.
The currency of the country, at that time, consisted mainly of the circulating notes of State banks, convertible, under the laws of the States, into coin on demand. This convertibility, though far from perfect, together with the acts of Congress which required the use of coin for all receipts and disbursements of the National government, insured the presence of some coin in the general circulation; but the business of the people was transacted almost entirely through the medium of bank notes. The State banks had recently emerged from a condition of great depreciation and discredit, the effects of which were still widely felt, and the recurrence of a like condition was not unreasonably apprehended by many. This apprehension was, in fact, realized by the general suspension of coin payments, which took place in 1857, shortly after the bond of Metz became due.
It is not to be doubted, then, that it was to guard against the possibility of loss to the estate, through an attempt to force the acceptance of a fluctuating and perhaps irredeemable currency in payment, that the express stipulation for payment in gold and silver coin was put into the bond. There was no necessity in law for such a stipulation, for at that time no money, except of gold or silver, had been made a legal tender. The bond without any stipulation to that effect would have been legally payable only in coin. The terms of the contract must have been selected, therefore, to fix definitely the contract between the parties, and to guard against any possible claim that payment, in the ordinary currency, ought to be accepted.
The intent of the parties is, therefore, clear. Whatever might be the forms or the fluctuations of the note currency, this contract was not to be affected by them. It was to be paid, at all events, in coined lawful money.
*247 We have just adverted to the fact that the legal obligation of payment in coin was perfect without express stipulation It will be useful to consider somewhat further the precise import in law of the phrase "dollars payable in gold and silver coin, lawful money of the United States."
To form a correct judgment on this point, it will be necessary to look into the statutes regulating coinage. It would be instructive, doubtless, to review the history of coinage in the United States, and the succession of statutes by which the weight, purity, forms, and impressions of the gold and silver coins have been regulated; but it will be sufficient for our purpose if we examine three only, the acts of April 2, 1792,[*] of January 18, 1837,[] and March 3, 1849."[]
The act of 1792 established a mint for the purpose of a national coinage. It was the result of very careful and thorough investigations of the whole subject, in which Jefferson and Hamilton took the greatest parts; and its general principles have controlled all subsequent legislation. It provided that the gold of coinage, or standard gold, should consist of eleven parts fine and one part alloy, which alloy was to be of silver and copper in convenient proportions, not exceeding one-half silver; and that the silver of coinage should consist of fourteen hundred and eighty-five parts fine, and one hundred and seventy-nine parts of an alloy wholly of copper.
The same act established the dollar as the money unit, and required that it should contain four hundred and sixteen grains of standard silver. It provided further for the coinage of half-dollars, quarter-dollars, dimes, and half-dimes, also of standard silver, and weighing respectively a half, a quarter, a tenth, and a twentieth of the weight of the dollar. Provision was also made for a gold coinage, consisting of eagles, half-eagles, and quarter-eagles, containing, respectively, two hundred and ninety, one hundred and thirty-five, and sixty-seven and a half grains of standard gold, and being *248 of the value, respectively, of ten dollars, five dollars, and two-and-a-half dollars.
These coins were made a lawful tender in all payments according to their respective weights of silver or gold; if of full weight, at their declared values, and if of less, at proportional values. And this regulation as to tender remained in full force until 1837.
The rule prescribing the composition of alloy has never been changed; but the proportion of alloy to fine gold and silver, and the absolute weight of coins, have undergone some alteration, partly with a view to the better adjustment of the gold and silver circulations to each other, and partly for the convenience of commerce.
The only change of sufficient importance to require notice, was that made by the act of 1837.[*] That act directed that standard gold, and standard silver also, should thenceforth consist of nine parts pure and one part alloy; that the weight of standard gold in the eagle should be two hundred and fifty-eight grains, and in the half-eagle and quarter-eagle, respectively, one-half and one-quarter of that weight precisely; and that the weight of standard silver should be in the dollar four hundred twelve and a half grains, and in the half-dollar, quarter-dollar, dimes, and half-dimes, exactly one-half, one-quarter, one-tenth, and one-twentieth of that weight.
The act of 1849[] authorized the coinage of gold doubleeagles and gold dollars conformably in all respects to the established standards, and, therefore, of the weights respectively of five hundred and sixteen grains and twenty-five and eight-tenths of a grain.
The methods and machinery of coinage had been so improved before the act of 1837 was passed, that unavoidable deviations from the prescribed weight became almost inappreciable; and the most stringent regulations were enforced to secure the utmost attainable exactness, both in weight and purity of metal.
*249 In single coins the greatest deviation tolerated in the gold coins was half a grain in the double-eagle, eagle, or half-eagle, and a quarter of a grain in the quarter eagle or gold dollar;[*] and in the silver coins, a grain and a half in the dollar and half-dollar, and a grain in the quarter-dollar, and half a grain in the dime and half-dime.[]
In 1849 the limit of deviation in weighing large numbers of coins on delivery by the chief coiner to the treasurer, and by the treasurer to depositors, was still further narrowed.
With these and other precautions against the emission of any piece inferior in weight or purity to the prescribed standard, it was thought safe to make the gold and silver coins of the United States legal tender in all payments according to their nominal or declared values. This was done by the act of 1837. Some regulations as to the tender, for small loans, of coins of less weight and purity, have been made; but no other provision than that made in 1837, making coined money a legal tender in all payments, now exists upon the statute-books.
The design of all this minuteness and strictness in the regulation of coinage is easily seen. It indicates the intention of the legislature to give a sure guaranty to the people that the coins made current in payments contain the precise weight of gold or silver of the precise degree of purity declared by the statute. It recognizes the fact, accepted by all men throughout the world, that value is inherent in the precious metals; that gold and silver are in themselves values, and being such, and being in other respects best adapted to the purpose, are the only proper measures of value; that these values are determined by weight and purity; and that form and impress are simply certificates of value, worthy of absolute reliance only because of the known integrity and good faith of the government which gives them.
The propositions just stated are believed to be incontestable. If they are so in fact, the inquiry concerning the legal import of the phrase "dollars payable in gold and silver *250 coin, lawful money of the United States," may be answered without much difficulty. Every such dollar is a piece of gold or silver, certified to be of a certain weight and purity, by the form and impress given to it at the mint of the United States, and therefore declared to be legal tender in payments. Any number of such dollars is the number of grains of standard gold or silver in one dollar multiplied by the given number.
Payment of money is delivery by the debtor to the creditor of the amount due. A contract to pay a certain number of dollars in gold or silver coins is, therefore, in legal import, nothing else than an agreement to deliver a certain weight of standard gold, to be ascertained by a count of coins, each of which is certified to contain a definite proportion of that weight. It is not distinguishable, as we think, in principle, from a contract to deliver an equal weight of bullion of equal fineness. It is distinguishable, in circumstance, only by the fact that the sufficiency of the amount to be tendered in payment must be ascertained, in the case of bullion, by assay and the scales, while in the case of coin it may be ascertained by count.
We cannot suppose that it was intended by the provisions of the currency acts to enforce satisfaction of either contract by the tender of depreciated currency of any description equivalent only in nominal amount to the real value of the bullion or of the coined dollars. Our conclusion, therefore, upon this part of the case is, that the bond under consideration was in legal import precisely what it was in the understanding of the parties, a valid obligation to be satisfied by a tender of actual payment according to its terms, and not by an offer of mere nominal payment. Its intent was that the debtor should deliver to the creditor a certain weight of gold and silver of a certain fineness, ascertainable by count of coins made legal tender by statute; and this intent was lawful.
Arguments and illustrations of much force and value in support of this conclusion might be drawn from the possible case of the repeal of the legal tender laws relating to coin, *251 and the consequent reduction of coined money to the legal condition of bullion, and also from the actual condition of partial demonetization to which gold and silver money was reduced by the introduction into circulation of the United States notes and National bank currency; but we think it unnecessary to pursue this branch of the discussion further.
Nor do we think it necessary now to examine the question whether the clauses of the currency acts, making the United States notes a legal tender, are warranted by the Constitution.
But we will proceed to inquire whether, upon the assumption that those clauses are so warranted, and upon the further assumption that engagements to pay coined dollars may be regarded as ordinary contracts to pay money rather than as contracts to deliver certain weights of standard gold, it can be maintained that a contract to pay coined money may be satisfied by a tender of United States notes.
Is this a performance of the contract within the true intent of the acts?
It must be observed that the laws for the coinage of gold and silver have never been repealed or modified. They remain on the statute-book in full force. And the emission of gold and silver coins from the mint continues; the actual coinage during the last fiscal year having exceeded, according to the report of the director of the mint, nineteen millions of dollars.
Nor have those provisions of law which make these coins a legal tender in all payments been repealed or modified.
It follows that there were two descriptions of money in use at the time the tender under consideration was made, both authorized by law, and both made legal tender in payments. The statute denomination of both descriptions was dollars; but they were essentially unlike in nature. The coined dollar was, as we have said, a piece of gold or silver of a prescribed degree of purity, weighing a prescribed number of grains. The note dollar was a promise to pay a coined dollar; but it was not a promise to pay on demand nor at any fixed time, nor was it, in fact, convertible into a coined dollar. It was impossible, in the nature of things, *252 that these two dollars should be the actual equivalents of each other, nor was there anything in the currency acts purporting to make them such. How far they were, at that time, from being actual equivalents has been already stated.
If, then, no express provision to the contrary be found in the acts of Congress, it is a just if not a necessary inference, from the fact that both descriptions of money were issued by the same government, that contracts to pay in either were equally sanctioned by law. It is, indeed, difficult to see how any question can be made on this point. Doubt concerning it can only spring from that confusion of ideas which always attends the introduction of varying and uncertain measures of value into circulation as money.
The several statutes relating to money and legal tender must be construed together. Let it be supposed then that the statutes providing for the coinage of gold and silver dollars are found among the statutes of the same Congress which enacted the laws for the fabrication and issue of note dollars, and that the coinage and note acts, respectively, make coined dollars and note dollars legal tender in all payments, as they actually do. Coined dollars are now worth more than note dollars; but it is not impossible that note dollars, actually convertible into coin at the chief commercial centres, receivable everywhere, for all public dues, and made, moreover, a legal tender, everywhere, for all debts, may become, at some points, worth more than coined dollars. What reason can be assigned now for saying that a contract to pay coined dollars must be satisfied by the tender of an equal number of note dollars, which will not be equally valid then, for saying that a contract to pay note dollars must be satisfied by the tender of an equal number of coined dollars?
It is not easy to see how difficulties of this sort can be avoided, except by the admission that the tender must be according to the terms of the contract.
But we are not left to gather the intent of these currency acts from mere comparison with the coinage acts. The currency acts themselves provide for payments in coin. Duties on imports must be paid in coin, and interest on the public *253 debt, in the absence of other express provisions, must also be paid in coin. And it hardly requires argument to prove that these positive requirements cannot be fulfilled if contracts between individuals to pay coin dollars can be satisfied by offers to pay their nominal equivalent in note dollars. The merchant who is to pay duties in coin must contract for the coin which he requires; the bank which receives the coin on deposit contracts to repay coin on demand; the messenger who is sent to the bank or the custom-house contracts to pay or deliver the coin according to his instructions. These are all contracts, either express or implied, to pay coin. Is it not plain that duties cannot be paid in coin if these contracts cannot be enforced?
An instructive illustration may be derived from another provision of the same acts. It is expressly provided that all dues to the government, except for duties on imports, may be paid in United States notes. If, then, the government, needing more coin than can be collected from duties, contracts with some bank or individual for the needed amount, to be paid at a certain day, can this contract for coin be performed by the tender of an equal amount in note dollars? Assuredly it may if the note dollars are a legal tender to the government for all dues except duties on imports. And yet a construction which will support such a tender will defeat a very important intent of the act.
Another illustration, not less instructive, may be found in the contracts of the government with depositors of bullion at the mint to pay them the ascertained value of their deposits in coin. These are demands against the government other than for interest on the public debt; and the letter of the acts certainly makes United States notes payable for all demands against the government except such interest. But can any such construction of the act be maintained? Can judicial sanction be given to the proposition that the government may discharge its obligation to the depositors of bullion by tendering them a number of note dollars equal to the number of gold or silver dollars which it has contracted by law to pay?
*254 But we need not pursue the subject further. It seems to us clear beyond controversy that the act must receive the reasonable construction, not only warranted, but required by the comparison of its provisions with the provisions of other acts, and with each other; and that upon such reasonable construction it must be held to sustain the proposition that express contracts to pay coined dollars can only be satisfied by the payment of coined dollars. They are not "debts" which may be satisfied by the tender of United States notes.
It follows that the tender under consideration was not sufficient in law, and that the decree directing satisfaction of the mortgage was erroneous.
Some difficulty has been felt in regard to the judgments proper to be entered upon contracts for the payment of coin. The difficulty arises from the supposition that damages can be assessed only in one description of money. But the act of 1792 provides that "the money of account of the United States shall be expressed in dollars, dimes, cents, and mills, and that all accounts in the public offices, and all proceedings in the courts of the United States, shall be kept and had in conformity to these regulations."
This regulation is part of the first coinage act, and doubtless has reference to the coins provided for by it. But it is a general regulation, and relates to all accounts and all judicial proceedings. When, therefore, two descriptions of money are sanctioned by law, both expressed in dollars and both made current in payments, it is necessary, in order to avoid ambiguity and prevent a failure of justice, to regard this regulation as applicable alike to both. When, therefore, contracts made payable in coin are sued upon, judgments may be entered for coined dollars and parts of dollars; and when contracts have been made payable in dollars generally, without specifying in what description of currency payment is to be made, judgments may be entered generally, without such specification.
We have already adopted this rule as to judgments for *255 duties by affirming a judgment of the Circuit Court for the District of California,[*] in favor of the United States, for thirteen hundred and eighty-eight dollars and ten cents, payable in gold and silver coin, and judgments for express contracts between individuals for the payment of coin may be entered in like manner.
It results that the decree of the Court of Appeals of New York must be reversed, and the cause remanded to that court for further proceedings.
Mr. Justice DAVIS.
I assent to the result which a majority of the court have arrived at, that an express contract to pay coin of the United States, made before the act of February 25th, 1862, commonly called the legal tender act, is not within the clause of that act which makes treasury notes a legal tender in payment of debts; but I think it proper to guard against all possibility of misapprehension by stating that if there be any reasoning in the opinion of the majority which can be applicable to any other class of contracts, it does not receive my assent.
Mr. Justice SWAYNE.
I concur in the conclusion announced by the Chief Justice. My opinion proceeds entirely upon the language of the contract and the construction of the statutes. The question of the constitutional power of Congress, in my judgment, does not arise in the case.
JUDGMENT REVERSED AND THE CASE REMANDED.
Mr. Justice MILLER, dissenting.
I do not agree to the judgment of the court in this case, and shall, without apology, make a very brief statement of my reasons for believing that the judgment of the Court of Appeals of New York should be affirmed. The opinion just read correctly states that the contract in this case, made before the passage of the act or acts commonly called the legal *256 tender acts, was an agreement to pay $1400 "in gold and silver coin, lawful money of the United States." And I agree that it was the intention of both parties to this contract that it should be paid in coin. I go a step farther than this, and agree that the legal effect of the contract, as the law stood when it was made, was that it should be paid in coin, and could be paid in nothing else. This was the conjoint effect of the contract of the parties and the law under which that contract was made.
But I do not agree that in this respect the contract under consideration differed, either in the intention of the parties, or in its legal effect, from a contract to pay $1400 without any further description of the dollars to be paid.
The only dollars which, by the laws then in force, or which ever had been in force since the adoption of the Federal Constitution, could have been lawfully tendered in payment of any contract simply for dollars, were gold and silver.
These were the "lawful money of the United States" mentioned in the contract, and the special reference to them gave no effect to that contract, beyond what the law gave.
The contract then did not differ, in its legal obligation, from any other contract payable in dollars. Much weight is attached in the opinion to the special intent of the parties in using the words gold and silver coin, but as I have shown that the intent thus manifested is only what the law would have implied if those words had not been used, I cannot see their importance in distinguishing this contract from others which omit these words. Certainly every man who at that day received a note payable in dollars, expected and had a right to expect to be paid "in gold and silver coin, lawful money of the United States," if he chose to demand it. There was therefore no difference in the intention of the parties to such a contract, and an ordinary contract for the payment of money, so far as the right of the payee to exact coin is concerned. If I am asked why these words were used in this case I answer, that they were used out of abundant caution by some one not familiar with the want of power in the States to make legal tender laws. It is very well known that *257 under the system of State banks, which furnished almost exclusively the currency in use for a great many years prior to the issue of legal tender notes by the United States, there was a difference between the value of that currency and gold, even while the bank notes were promptly redeemed in gold. And it was doubtless to exclude any possible assertion of the right to pay this contract in such bank notes, that the words gold and silver coin were used, and not with any reference to a possible change in the laws of legal tender established by the United States, which had never, during the sixty years that the government had been administered under the present Constitution, declared anything else to be a legal tender or lawful money but gold and silver coin.
But if I correctly apprehend the scope of the opinion delivered by the Chief Justice, the effort to prove for this contract a special intent of payment in gold, is only for the purpose of bringing it within the principle there asserted, both by express words and by strong implication, that all contracts must be paid according to the intention of the parties making them. I think I am not mistaken in my recollection that it is broadly stated that it is the business of courts of justice to enforce contracts as they are intended by the parties, and that the tender must be according to the intent of the contract.
Now, if the argument used to show the intent of the parties to the contract is of any value in this connection, it is plain that such intent must enter into, and form a controlling element, in the judgment of the court, in construing the legal tender acts.
I shall not here consume time by any attempt to show that the contract in this case is a debt, or that when Congress said that the notes it was about to issue should be received as a legal tender in payment for all private debts, it intended that which these words appropriately convey. To assume that Congress did not intend by that act to authorize a payment by a medium differing from that which the parties intended by the contract is in contradiction to the express language of the statute, to the sense in which it was acted on by *258 the people, who paid and received those notes in discharge of contracts for incalculable millions of dollars, where gold dollars alone had been in contemplation of the parties, and to the decisions of the highest courts of fifteen States in the Union, being all that have passed upon the subject.
As I have no doubt that it was intended by those acts to make the notes of the United States to which they applied a legal tender for all private debts then due, or which might become due on contracts then in existence, without regard to the intent of the parties on that point, I must dissent from the judgment of the court, and from the opinion on which it is founded.
NOTES
[*] 1 Stat. at Large, 246.
[] 5 Id. 136.
[] 9 Id. 397
[*] 5 Stat. at Large, 137.
[] 9 Id. 397.
[*] 9 Stat. at Large, 398.
[] 5 Id. 140.
[*] Cheang-Kee v. United States, 3 Wallace, 320.